# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

EUGENE H. WESTBROOK,     )
                           )
     **Plaintiff,**         )
                           )
    v.                 )     **Case number 4:08cv0705 TCM**
                           )
MICHAEL J. ASTRUE,      )
**Commissioner of Social Security,**   )
                           )
     **Defendant.**       )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying Eugene

H. Westbrook's applications for disability insurance benefits ("DIB") under Title II of the

Social Security Act ("the Act"), 42 U.S.C. § 401-433, and supplemental security income

("SSI") under Title XV of the Act, 42 U.S.C. § 1381-1383b. Mr. Westbrook ("Plaintiff") has

filed a brief in support of his complaint; the Commissioner has filed a brief in support of his

answer. The case is before the undersigned for a final disposition pursuant to the written

consent of the parties. <u>See</u> 28 U.S.C. § 636(c).

## Procedural History

Plaintiff applied for DIB and SSI in March 2005, alleging a disability since February

18, 2005, caused by hypertension, a heart attack, and heart damage. (R. at 73-79.)[1] His

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

applications were denied initially and after a hearing in February 2006 before Administrative Law Judge ("ALJ") F. Terrell Eckert, Jr. (Id. at 12-18, 38-39, 42-46.) The Appeals Council denied his request for review, thereby adopting the ALJ's adverse decision as the final decision of the Commissioner. (Id. at 4-6.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff testified he was born on May 22, 1949, and was then 56 years old. (Id. at 321.) He was 5 feet 9 inches tall and weighed approximately 210 pounds. (Id. at 322.) Before his heart attack, he had weighed 190 pounds. (Id. at 323.) He was right-handed. (Id.) He lived in a house with his wife. (Id. at 321.)

Plaintiff completed the tenth grade in school and earned a General Equivalency Degree ("GED"). (Id. at 322.) He had been in regular education classes. (Id.) He had no problem reading and writing. (Id.) He had not had any formal training of any other kind. (Id.) He had been in the Army from July 1967 to July 1969 and had received an honorable discharge. (Id. at 323.) He was no longer working. (Id. at 323, 324.)

Plaintiff had worked at a meat company for seven to eight years. (Id. at 323-24.) The job required some heavy work, e.g., lifting boxes of meat weighing 100 pounds, and some light work. (Id. at 324.) His job at Compass required that he stock coolers, take out the trash, and be a prep cook. (Id.) He had to lift at that job also. (Id.)

He went to the hospital on February 18, 2005, after having a heart attack and had four stents placed in him.  (Id. at 325, 336.)  The most severe, current problem he has is memory loss.  (Id. at 325.)  This problem started after his heart attack and was manifested in such ways as him becoming lost.  (Id.)  Asked about the psychologist he was referred to, he said he remembered seeing someone but did not remember who.  (Id.)  One time, he went to the wrong Veterans' Administration ("VA") hospital.  (Id. at 326.)  Another time, he turned the wrong direction when leaving a store a few blocks from his home.  (Id. at 327.)  He became lost on his way to the hearing and had to stop and ask for directions.  (Id. at 327-28.)  He was taking medication for his memory problems, but it did not help.  (Id. at 328.)

Asked about his wife's comment in a medical record that Plaintiff was occasionally aggressive, Plaintiff responded that he did not remember being so but guessed that he did because his wife would pick up things and want to hit him with them.  (Id.)  He likes to watch the same television programs, mysteries and police stories, over and over again.  (Id. at 328-29.)  He is not able to remember the plots.  (Id. at 329.)  He forgets what he reads.  (Id. at 329, 334.)  His wife tells him he watches the same programs over and over again.  (Id. at 329.)  If his wife wanted him to pick up four to five items from the store, she would have to write them down.  (Id. at 330.)

Plaintiff further testified that he was supposed to see a neuropsychologist.  (Id. at 329.)  He does not know why.  (Id. at 330.)

Plaintiff no longer has any chest pain, but does get anxious.  (Id. at 330-31.)

He takes nitroglycerin as needed, maybe once or twice every two weeks.  (Id. at 331.)
He takes it when he feels that "everything is coming in at [him]" and when his wife yells at
him.  (Id. at 332.)  He does not do a lot of work around the house because he is not an
electrician and is not a plumber.  (Id.)  His wife does not feel he does a good job with the
household chores.  (Id.)  He thinks he does a fine job.  (Id.)  Plaintiff has problems
organizing.  (Id.)

Plaintiff does not have any side effects from taking the nitroglycerin, but does have
problems with lightheadedness from a new medication.  (Id. at 333.)  His doctors have
spoken with him about how they want to treat his heart, but he cannot remember what they
have said.  (Id.)

Plaintiff likes to fish.  (Id.)  He has not been fishing since the heart attack because his
wife won't let him.  (Id. at 334.)  She says it is too cold.  (Id.)  He has trouble sleeping
because he gets up and raids the refrigerator.  (Id.)  He thinks that might be why he is gaining
weight.  (Id.)

Asked by the ALJ if he had memory problems before his heart attack, Plaintiff replied
that he could not remember, but did not think he had.  (Id. at 335.)  Asked about his heart
attack, Plaintiff explained that he had gotten angry with his boss when the boss was telling
him what to do.  (Id.)  He told his boss he was only one guy and there were four of "you
guys."  (Id.)  His boss responded that it was his job.  (Id.)  Plaintiff started stocking the
cooler, taking out the trash, getting the bread off the elevator, doing the dishes and prep
cooking, and then "the next thing [he] knew [he] just wandered off."  (Id.)  When he

returned, his boss yelled at him.  (<u>Id.</u> at 335-36.)  He replied and then started sweating and feeling cold.  (<u>Id.</u> at 336.)  He called his wife and said he was having a heart attack.  (<u>Id.</u>)  He wanted someone at work to call a doctor, but they all laughed at him.  (<u>Id.</u>)  He called his wife again, who told someone at his job to call "911."  (<u>Id.</u>)  He then passed out.  (<u>Id.</u>)  The next thing he remembered, he was at the hospital and had surgery to place four stents in him.  (<u>Id.</u>)  He learned a few months ago that he will have to have another surgery.  (<u>Id.</u>)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed by Plaintiff as part of the application process; medical records; and medical evaluation reports.

On a Function Report, Plaintiff reported that he forgot to do things around the house, just sat around and watched television, or sat outside.  (<u>Id.</u> at 142-49.)  His wife cooked supper.  (<u>Id.</u> at 142.)  He was unable to do manual labor.  (<u>Id.</u> at 143.)  His wife had to help him remember to do things, to put the right clothes on, and to remind him to get his hair cut.  (<u>Id.</u>)  He could not sleep well and woke up in the middle of the night.  (<u>Id.</u>)  Although he forgot to take a shower regularly, he could feed himself.  (<u>Id.</u>)  His wife also had to remind him to take his medicine.  (<u>Id.</u> at 144.)  He waited for his wife to fix his meals.  (<u>Id.</u>)  He tried to do dishes and to clean the bathroom; his wife did the housework and yardwork.  (<u>Id.</u> at 144-45.)  He did not know how to operate the lawnmower.  (<u>Id.</u> at 145.)  He did not have a driver's license.  (<u>Id.</u> at 145.)  His wife did the shopping.  (<u>Id.</u>)  His wife also paid the bills and balanced the checkbook.  (<u>Id.</u>)  Although he sometimes spent time with other people, he would eventually get aggravated and leave.  (<u>Id.</u> at 146.)  He did go the store with his wife,

and his wife went with him to doctor's appointments and to visit other people.  (Id.)  His family had disowned him; his friends tolerated him.  (Id. at 147.)  He did not have any close neighbors.  (Id.)  He used to get along with people; now, he upset them.  (Id.)  His impairments affected his ability to lift, stand, walk, see, remember, complete tasks, concentrate, understand, follow instructions, and get along with others.  (Id.)  He could walk no farther than two blocks without needing to rest for at least five minutes.  (Id.)  He could not follow instructions well, cope with stress, or handle changes in routine.  (Id. at 148.)  He had worn glasses since January 2005.  (Id.)

On a Disability Report – Appeal form, Plaintiff reported that his memory was worse since February 20, 2005.  (Id. at 127-33.)  He was unable to comprehend simple instructions or directions, needed help remembering doctor's appointments, and had to be reminded to complete simple chores.  (Id. at 128.)

A work history report asking for information about jobs Plaintiff had held during the past 15 years listed one as a meat packer from May 1997 to July 2004 and another as a utility worker from December 2004 to February 2005.  (Id. at 105, 113.)  An earnings record generated for Plaintiff for the years 1998 to 2004, inclusive, lists annual earnings that ranged from $3,461 in 1998 to $23,976 in 2003.  (Id. at 83, 95.)  The earnings in his last year of reported income, 2004, were $10,449.  (Id.)  He then worked for R & W Meat Co., Inc., as a meat packer.  (Id. at 85-86.)

Plaintiff's medical records before the ALJ are summarized below in chronological order.

On February 18, 2005, Plaintiff was admitted to St. Mary's Health Center ("St. Mary's") after going to the emergency room with complaints of severe substernal chest pain. (Id. at 152-71, 226-46.) He had had no prior cardiac history and described a fight he had had with his manager. (Id. at 158, 162.) On arrival, his blood pressure was 90/90. (Id. at 228.) His electrocardiogram "(ECG)" revealed a myocardial infarction; a coronary angiogram revealed severe acute coronary disease. (Id. at 152, 228.) An ultrasound did not reveal any deep vein thrombosis. (Id. at 152.) An echocardiograph revealed sinus bradycardia (a slow heartbeat), a left ventricular ejection fraction of 59%, left atrial enlargement, and mild mitral and tricuspid insufficiency with a pulmonary artery pressure estimated at 27 millimeters. (Id. at 154.) There was, however, no sign of congestive failure. (Id. at 167.) His social history included being a nonsmoker and engaging in occasional alcohol use. (Id. at 228.) His stress factors included stress, hypertension, high cholesterol, family history, and being a cigar smoker. (Id. at 232.) After catherization, his blood pressure was 120/60. (Id. at 228.) Plaintiff underwent open heart surgery with four cardiac stents inserted; his chest pain was completely resolved after an angioplasty. (Id. at 152, 159, 230.) On February 20, he was reportedly doing well and had no recurrent angina. (Id. at 240.) The next day, he and his wife spoke to a counselor at the hospital about applying for social security disability. (Id. at 238.) On February 22, Plaintiff was given an exercise therapy program and instructed on cholesterol management and medication compliance. (Id. at 239.) His blood pressure was found to be borderline when in he was in the hospital, so he was placed on a beta blocker and ASE inhibitor. (Id. at 152, 238.) He was also continued on aspirin, Plavix, and Zocor, an

anti-lipid medication.  (Id. at 152.)  When he was in the hospital he was symptom free.  (Id.)

On February 23, he was discharged in stable condition.  (Id. at 152, 227.)  His blood pressure

was 102/60.  (Id. at 227.)  His  medications included Atenobol (a beta blocker), aspirin,

Plavix, Lipitor (cholesterol-lowing medication), and Lisinopril (for hypertension).  (Id. at

226.)  Discharge instructions included avoiding strenuous work for one month, following a

cardiac diet, no driving for two days, participating in cardiac rehabilitation for six weeks, and

following up in one month with Dr. Manoj Eapen.  (Id. at 153, 226.)

Two days later, Plaintiff went to the Veterans' Administration Hospital ("VA"),

explaining that he had had chest pain when at work the week before and had been taken to

St. Mary's, where he had had three[2] cardiac stents inserted (Id. at 189.)  His wife reported

that he was anxious.  (Id.)  Plaintiff reported that he was short of breath.  (Id.)  He was

advised to start taking aspirin and Plavix.  (Id.)  He was told not to walk too fast and to avoid

lifting anything heavier than a gallon of milk.  (Id.)  He reported that he could not walk

farther than a city block without needing to rest.  (Id.)  He was encouraged to restrict fat in

his diet and increase fiber, fruit, and vegetables.  (Id.)  He smoked one to two packs of

cigarettes a day.  (Id. at 192.)  He was described as having a history of alcohol use during the

past year; specifically, he reported that he had a drink with alcohol two to four times a

month, would drink ten or more drinks with alcohol when he did, and did so weekly.  (Id.

at 191.)  A depression screening was negative.  (Id.)  He was to contact the psychiatry clinic

---

[2]This is an error.  Plaintiff had four cardiac stents inserted.

to schedule an appointment.  (Id. at 190.)  He was taking over-the-counter medications.  (Id. at 191.)

On March 2, Plaintiff consulted Dr. Eapen with the Metro Heart Group.  (Id. at 174-75, 250-51, 253.)   He reported that he had a history of hypercholesterolemia and hypertension.  (Id. at 174.)  He denied any chest pain, shortness of breath, palpitations, or lightheadedness during the visit.  (Id.)  He was alert and oriented to time, place, and person.  (Id.)  His mood was pleasant.  (Id.)  On examination, his blood pressure was 90/60, his breathing was unlabored, his lungs were clear to auscultation, and his blood pressure was borderline, with no related symptoms.  (Id. at 174-75.)  He was compliant with his medication.  (Id. at 175.)  Relaxation methods were discussed, and it was recommended that he start an exercise program in four to six weeks, gradually increasing his activity level.  (Id.)  Dr. Eapen noted that Plaintiff should be able to go back to work in one to two months.  (Id.)  An echocardiogram was to be done in three months to assess his left cardiac ventricle systolic function; a myocardial perfusion study was to be done in six to twelve months to rule out stent restenosis.  (Id.)

Two days later, Plaintiff returned to the VA, reporting that he was breathing better since his last visit.  (Id. at 182-86.)  He denied having any chest pain.  (Id. at 182.)  He was alert, cooperative, and in no acute distress.  (Id. at 183.)   His wife reported that his cardiologist had said that Plaintiff had had a massive myocardial infarction and had recommended further testing.  (Id.)  A chest x-ray was normal.  (Id. at 183.)  Plaintiff was to repeat the laboratory tests in May and to continue with his current medications.  (Id.)  It

was also recommended that he undergo neuropsychological testing.  (Id.)  The examining nurse, Nancy Rodenberg, an advanced practice nurse, noted that, in her opinion, Plaintiff needed SSI based on his mental and cardiac conditions.  (Id.)

On March 31, Dr. Eapen noted that Plaintiff's wife had called, reporting that he had some shortness of breath with a lot of exertion but not at rest.  (Id. at 175.)  He had no swelling in his lower extremities.  (Id.)  It was recommended that Plaintiff restrict his salt intake.  (Id.)  He was also encouraged to engage in daily exercise.  (Id.)

Plaintiff returned to the VA on April 18.  He reported that his medication was helping and he was eating okay.  (Id. at 180.)  He was alert, cooperative, and in no acute distress.  (Id.)  Although he felt that he was sleeping well, his wife reported that he had restless leg movements.  (Id.)  He had been unable to attend the depression education class due to transportation problems.  (Id. at 180-81.)

Plaintiff's chief complaint when he was seen at the VA primary care clinic on May 3 was that he was not sleeping soundly, was talking during sleep, and was experiencing rapid leg movement when sleeping.  (Id. at 179.)  He was taking only VA-prescribed medication and no over-the-counter medications.  (Id.)  He denied chest pain, but did have pain in his left flank since the surgery.  (Id.)  He was alert, cooperative, and in no acute distress.  (Id. at 180.)  A sleep study was to be performed to rule out restless leg syndrome.  (Id.)  To address his concerns about not being able to ejaculate, hormone testing was advised.  (Id.)  A digital rectal exam was normal.  (Id.)

When Plaintiff again saw Dr. Eapen, on August 3, he was reportedly doing fairly well from a cardiac point of view. (Id. at 248-49.) He had no chest pain, shortness of breath, palpitation, or lightheadedness. (Id. at 248.) He did have atypical left low back pain. (Id.) He did not have an exercise program, but was compliant with his medications, with the exception of not getting a refill of Plavix two weeks before. (Id.) He reportedly had quit smoking after his myocardial infarction and engaged only in occasional alcohol use. (Id.) On examination, he was not in acute distress and his blood pressure was 102/70, which was on the low side. (Id.) Plaintiff reported that he could not tolerate high doses of Atenobol or Lisinopril. (Id.) Dr. Eapen strongly recommended that Plaintiff start an exercise program. (Id.) He also noted that Plaintiff had stopped taking Lipitor a few weeks before. (Id.) Plaintiff was given samples of both Plavix and Lipitor. (Id.) Dr. Eapen also recommended that he undergo an exercise myocardial perfusion stress test in three or four months to rule out in-stent restenosis. (Id.) Plaintiff was to follow up with him in one year. (Id.)

On September 26, Plaintiff consulted C.J. Jos, M.D., a psychiatrist at the VA, about his anger. (Id. at 268-71, 307-10.) It was noted that his last Global Assessment of Functioning[3] ("GAF") score, in February 2000, was 60.[4] (Id. at 270.) He was prescribed

---

[3]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008).

[4]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic Manual at 34.

one-half tablet nightly of Risperidone, an antipsychotic medication, for his anger.  (Id. at 269, 270.)  Plaintiff and his wife reported to Dr. Jos that he had gotten lost driving and had gone to the John Cochran VA rather than the Jefferson Barrack VA.  (Id. at 271, 310.) Plaintiff stated that his memory of recent events was impaired.  (Id.)  He was irritable and had threatened to break a window.  (Id.)  Neuropsychological testing was to be done in October.  (Id.)  His diagnoses included psychosis, not otherwise specified, depression, and anxiety.  (Id. at 269.)  They also included, inter alia, gastroesophageal reflux disease (GERD), headaches, and degenerative joint disease.  (Id.)

In October, Plaintiff underwent a Doppler echocardiogram at the Metro Heart Group. (Id. at 252.)  This revealed a mild to moderate mitral regurgitation and a mild triscuspid regurgitation.  (Id.)

On November 17, Plaintiff went to the primary care clinic of the VA with complaints of intermittent pain in his right side.  (Id. at 262-67.)  X-rays of his lumbar spine and abdomen were taken.  (Id. at 279-80.)  With the exception of a small spur from the superior margin of L4 and L5, there was no abnormality.  (Id.)  His wife reported that his behavior was explosive at times and that he was becoming aggressive.  (Id. at 264.)  He was out of Risperidone; he had had to cancel a psychiatric consultation.  (Id.)  The physician opined that Plaintiff needed a stronger dose of Rispiradone and advised him to go to the psychiatric clinic that day and reschedule.  (Id. at 266.)  Plaintiff was instructed on how to obtain refills of his medication.  (Id. at 263.)  He reported that he smoke one to two cigars on the weekends.  (Id. at 267.)

Plaintiff had an exercise stress test on December 12.  (<u>Id.</u> at 260-62.)  His performance was average for his age and sex.  (<u>Id.</u> at 261, 262.)  The test was inconclusive for evidence of inducable myocardial ischemia ; subsequently, a stress single photo emission-computed tomography ("SPECT") myocardial imaging test was performed and indicated a small anteroseptal infarct and a small inferoapical fixed defect.  (<u>Id.</u> at 272-79.)

On January 18, 2006, Plaintiff returned to the primary care clinic with complaints of being lightheaded and experiencing tingling in his body until he took nitroglycerin.  (<u>Id.</u> at 256-60.)  He had tried taking two doses of the nitroglycerin at one time; it did not help.  (<u>Id.</u> at 256.)  He denied having any chest pain or headaches.  (<u>Id.</u>)  His wife reported that he had been eating large portions, trying to help her son, and trying to clean out the house.  (<u>Id.</u>)  His blood pressure was 113/74.  (<u>Id.</u> at 259.)  Plaintiff reported that he did not exercise and was instructed on the health benefits of regular exercise and on the three types of exercise: aerobics, flexibility, and endurance.  (<u>Id.</u> at 260.)  His medications included Atenolol, clopidogrel bisulfate (to thin blood), Lisinopril, nitroglycerin, paroxetine (for treatment of panic disorder), Risperidone, and Simvastatin (Zocor).  (<u>Id.</u> at 256-57.)  Again, his diagnoses included, inter alia, psychosis, not otherwise specified, depression, anxiety, GERD, headaches, and degenerative joint disease.  (<u>Id.</u> at 256.)

On April 17, Plaintiff consulted Dr. Jos for his anxiety.  (<u>Id.</u> at 298-303.)  He had problems with anger and throwing things.  (<u>Id.</u> at 301.)  He would still get lost.  (<u>Id.</u>)  His wife reported that he had had a change in personality since his heart attack.  (<u>Id.</u>)  His sleep was described as good; his mood and affect as normal.  (<u>Id.</u> at 302.)  It was reported that he

drank wine or beer on weekends; he was instructed not to drink alcohol when taking his medication. (<u>Id.</u>) His current GAF was 70.[5] (<u>Id.</u> at 302.) A computed tomography ("CT") scan of Plaintiff's head was ordered. (<u>Id.</u>) Anger management classes were offered; Plaintiff declined. (<u>Id.</u>) The CT scan, performed in June, was normal. (<u>Id.</u> at 304.)

A test on May 3 indicated no arterial insufficiency in either leg at rest. (<u>Id.</u> at 293-94.) Plaintiff went to the VA primary care clinic on May 11 with complaints of pain and a rash in his lower back. (<u>Id.</u> at 294-98.)

On June 1, Plaintiff underwent testing by John R. Hogg, Ph.D., at the VA neuropsychology clinic. (<u>Id.</u> at 282-93.) He complained of short-term memory problems. (<u>Id.</u> at 282.) He would forget conversations with his wife and forget to do chores. (<u>Id.</u>) His wife told him he would not finish jobs properly. (<u>Id.</u>) He had had memory problems since he had known his wife, approximately five years ago. (<u>Id.</u>) His wife reported that Plaintiff had a history of an explosive temper when he worked at the meat packing company but had kept his job because he was a hard worker. (<u>Id.</u>) He had been laid off from the meat packing company and had eventually found employment in January 2005 with the restaurant company that she worked for. (<u>Id.</u>) He had difficulties in that job remembering things and was working twelve to fourteen hour shifts. (<u>Id.</u>) The physicians at St. Mary's, where he had been treated for his heart attack, had told her he would probably have a memory loss and

---

[5]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." <u>Diagnostic Manual</u> at 34.

personality change due to loss of oxygen during the attack.  (<u>Id.</u> at 283.)  Although he had anger problems before the attack, they and the memory loss were worse after the attack.  (<u>Id.</u>)  It was noted that Plaintiff had been treated by Dr. Jos for anxiety before his heart attack and had returned following the attack.  (<u>Id.</u> at 286.)  During the clinical interview, Plaintiff had a normal affect.  (<u>Id.</u> at 288.)  He was "generally neutral during the testing," but "reported [an] irritable, anxious mood."  (<u>Id.</u>)  He was sometimes calm and sometimes agitated and frustrated.  (<u>Id.</u>)  "He displayed limited task persistence, notably low frustration tolerance, and rapid, impulsive responding on forced choice items."  (<u>Id.</u>)  His variability of effort during testing "raise[d] clinical concerns about the about the validity of any cognitive difficulties observed on current neuropsychological testing.  Overall, current neuropsychological evaluation is not considered valid for standard clinical interpretation."  (<u>Id.</u> at 289.)  The tests included the Wechsler Abbreviated Scales of Intelligence ("WASI"), on which Plaintiff had a full scale intelligence quotient ("IQ") of 71 and a performance IQ of 79, both placing him in the borderline range of intellectual functioning.  (<u>Id.</u>)  An estimated verbal IQ of 69 placed him in the extremely low range.  (<u>Id.</u>)  His performance on this test was "notably inconsistent."  (<u>Id.</u>)  Plaintiff also placed in the borderline range on the Letter-Numbering Sequencing task.  (<u>Id.</u>)  Plaintiff's performance on verbal memory tasks indicated an "extremely low initial ability to retain verbal information in memory storage after a delay."  (<u>Id.</u> at 290.)  His performance on an Auditory Delayed Memory Index was similar.  (<u>Id.</u>)  He had an impaired immediate learning curve on a rote verbal learning task.  (<u>Id.</u>)  Plaintiff's results on the WASI Similarities subtest were in the borderline range; his

results on the Rey Complex Figure with Extended Complex Figure Test were in the low average range.  (<u>Id.</u> at 290-91.)  His inconsistent score on the 21 Item test, "a task measuring biased responding on memory tasks," "was unusual in that he failed to recognize correctly either of the two words which he had just freely recalled during the forced choice test."  (<u>Id.</u> at 291.)  His score on another test to measure biased responding on cognitive tasks indicated a limited effort.  (<u>Id.</u>)  Dr. Hogg concluded that the presence of an objective memory dysfunction could not be established by the neuropsychological evaluation.  (<u>Id.</u> at 292.)  He also concluded that Plaintiff's medical history indicated issues with anger management; Plaintiff was encouraged to reconsider his earlier refusal to participate in anger management courses.  (<u>Id.</u>)  Further neuropsychological testing was unlikely to be valid until such time as Plaintiff had better basic frustration tolerance.  (<u>Id.</u>)  The diagnosis was anxiety disorder, not otherwise specified, by history.  (<u>Id.</u>)

The results of the neuropsychological evaluation were discussed by Dr. Hogg with Plaintiff and his wife over the telephone on June 5.  (<u>Id.</u> at 281-82.)  Plaintiff expressed some willingness to reconsider his decision on anger management courses.  (<u>Id.</u> at 281.)

In addition to the records of Plaintiff's medical treatment, the ALJ had before him a letter written on behalf of Plaintiff and the reports of several consultants, some examining and some non-examining.

At Plaintiff's request, a March 10, 2005, letter from two health care providers at the VA explained that Plaintiff was a current active patient, suffered from coronary active disease, and had recently suffered a myocardial infarction that had "damaged a significant

portion of his myocardium."  (Id. at 172, 181.)  He was "too ill currently to assess his tolerance to physical activity."  He was to undergo a neuropsychological exam.  (Id. at 172.)  His psychiatric history was "significant for anxiety and psychosis."  (Id.)

On September 13, 2005, Plaintiff was evaluated by Llewellyn Sale, Jr., M.D.  (Id. at 193-98.)  His chief complaints were heart attack and heart damage, hypertension, and high cholesterol.  (Id. at 193.)  He had no current symptoms of a heart attack, no angina, no respiratory problems, and no history of congestive heart failure.  (Id.)  He did normal daily activities, occasionally drove a car, and regularly went out of the house.  (Id.)  He tried to walk ten to fifteen minutes a day.  (Id.)  He exercised without symptomatology.  (Id.)  He had had hypertension for ten years without complications until the recent heart attack.  (Id. at 194.)  His medications included Plavix (clopidogrel bisulfate), Lipitor, Lisinopri, Atenolol, aspirin, and nitroglycerin.  (Id.)  He used to smoke a few cigars on the weekend.  (Id.)  His alcoholic consumption was limited to two glasses of wine on the weekend.  (Id.)

On examination, Plaintiff was in no acute distress.  (Id.)  No heart murmur was heard.  (Id.)  His gait was normal, without the use of an assistive device.  (Id. at 195.)  He got on and off the examining table without difficulty.  (Id.)  His blood pressure was described as being well-controlled.  (Id.)  He continued to have bradycardia (a slow heartbeat).  (Id.)  Dr. Sale completed a Symptom Questionnaire, reporting that Plaintiff did not have exertional dyspnea, dyspnea at rest, or peripheral edema.  (Id. at 196.)  He did not have chest pain.  (Id.)  He had a normal range of motion in his shoulders, elbows, wrists, knees, hips, ankles, and

spine.  (Id. at 197-98.)  He had a normal grip strength and no pain on straight leg raising.

(Id.)

Also on September 13, Plaintiff underwent a psychological evaluation by Sherman Sklar, M.E., a licensed psychologist. (Id. at 199-203.)  The report of this evaluation includes the notation in the VA record about Plaintiff drinking two to four times a month and sometimes having ten drinks at one setting.  (Id. at 199.)  He had been married for two years and had last worked as a utility worker in a restaurant, where he had suffered a heart attack. (Id.)  Before that job, he had worked as a laborer for a meat company.  (Id.)  Plaintiff explained that he had had a memory loss and could not remember much about himself.  (Id.) He asked that his wife be allowed to help him because she "knew everything about him." (Id.)  Plaintiff was able to give answers; his wife participated in the interview halfway through.  (Id.)  Plaintiff's chief complaint was that he forgot a lot.  (Id. at 200.)  He and his wife reported that he had shown "significant deterioration in his behavior" since his heart attack.  (Id.)  His memory was "very bad."  (Id.)  He was easily lost and confused when he left the house.  (Id.)  He had no history of psychiatric treatment, but had seen a psychologist once or twice after his heart attack.  (Id.)  He had completed the tenth grade, had been in regular education classes, and had obtained a GED.  (Id.)  He had had a traumatic childhood. (Id.)  When he was fourteen years old, he had been kicked out of the house by his stepfather. (Id.)  He had been in and out of jail for many years; his last incarceration had been in 1995 for burning down a girlfriend's apartment.  (Id.)  Other offenses had included burglary and tampering.  (Id.)  Since his heart attack, he only drank wine at meals.  (Id.)  His wife reported

that he was easily angered since his heart attack and had little control over his behavior or emotions. (Id.) Describing his daily activities, he reported that he went fishing whenever possible at a nearby lake, listened to music, and did small household tasks. (Id.) On examination, he was coherent, relevant, logical, and reactive, as opposed to spontaneous. (Id. at 201.) His cooperation with Sklar was poor to fair. (Id.) He had a normal affect and gave no indication of a thought disturbance. (Id.) He spoke with an adequate speed, but "his verbalizations did not provide much information about his functioning." (Id.) He was oriented to time, person, and place. (Id. at 202.) He could recall all six of the digits given. (Id.) His ability to respond to short-term and long-term memory questions, e.g., naming four past presidents, indicated that "his claim of significant memory problems [was] exaggerated." (Id.) He could not understand or do serial 3 tasks and could not interpret either of two proverbs. (Id.) He reported that his wife paid the bills and cooked. He helped a little with some of the simple household chores and went grocery shopping. (Id.) He drove, rode the bus, read, and liked going out to eat. (Id.) He socialized with neighbors and friends. (Id.) He reported that his ability to focus was extremely impaired, even for short period of time. (Id. at 202-03.) There was no diagnosis of a mental impairment. (Id.) His GAF score was 50.[6] (Id. at 203.)

---

[6]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic Manual at 34.

The ALJ also had before him a Physical Residual Functional Capacity assessment of Plaintiff. (Id. at 204-11.) Plaintiff's primary diagnosis was coronary artery disease and status post myocardial infarction; his secondary diagnosis was hypertension. (Id. at 204.) He could occasionally lift 50 pounds, frequently lift 25 pounds, and stand, walk, or sit for six hours in an 8-hour workday. (Id. at 205.) He had an unlimited ability to push and pull. (Id.) He had no postural, manipulative, visual, communicative, or environmental limitations. (Id. at 206-09.)

On a Psychiatric Review Technique form, it is noted that Plaintiff had no medically determinable mental impairment. (Id. at 212-25.)

### The ALJ's Decision

After first finding that Plaintiff had not engaged in substantial gainful activity after his alleged disability onset date of February 18, 2005, the ALJ then decided that he had coronary artery disease and an anxiety disorder, not otherwise specified, but did not have an impairment or combination of impairments of Listing-level severity. (Id. at 12-13, 16.) Specifically, his coronary artery disease did not satisfy any of the Section 4.00 cardiac listings and his anxiety disorder did not satisfy Listing 12.02B for an organic impairment or Listing 12.06B for an anxiety disorder. (Id. at 13.)

The ALJ next addressed the question of Plaintiff's residual functional capacity ("RFC"). In doing so, he first evaluated Plaintiff's credibility. (Id. at 13-15.) He found that, based on the objective testing, Plaintiff did not have a memory impairment. (Id. at 14.) Although Plaintiff and his wife reported debilitating anger, irritability, and confusion, he was

routinely described in the medical records as being alert and cooperative or in a pleasant mood.  (<u>Id.</u>)  The exaggeration evident in the description of his mental impairment was also present in his and his wife's description of his myocardial infarction.  (<u>Id.</u>)  For instance, his wife reported that he had had a massive heart attack; there had been a small infarction.  (<u>Id.</u> at 14-15.)  And, he had done well afterwards.  (<u>Id.</u> at 15.)  Treating physicians have observed him to be in no acute distress.  (<u>Id.</u>)  His physical examinations have been unremarkable.  (<u>Id.</u>)  His treadmill testing showed a good exercise tolerance.  (<u>Id.</u>)  His ejection fraction is a normal 60%.  (<u>Id.</u>)  He has been prescribed a cardiac diet, but has gained weight.  (<u>Id.</u>)  He has been told to exercise, but has not.  (<u>Id.</u>)  Such failures to comply with prescribed treatment are inconsistent with disabling conditions.  (<u>Id.</u>)

Plaintiff did have, however, symptoms limiting his ability to work.  (<u>Id.</u> at 15.)  He could not engage in heavy or strenuous work, but could work at the medium or less exertional levels.  (<u>Id.</u>)  Because of his anxiety disorder, he was also limited to simple work.  (<u>Id.</u>)  With his restrictions, Plaintiff could not return to his past relevant work.  (<u>Id.</u> at 16.)  He was of an advanced age and limited education.  (<u>Id.</u>)  Even so, applying the Medical-Vocational Guidelines, Plaintiff could perform the full range of medium work[7] and was not disabled.  (<u>Id.</u>)

## <u>Additional Medical Records Before the Appeals Council</u>

---

[7]Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects up to 25 pounds."  20 C.F.R. § 404.1567(c).  If someone can do medium work, he can do sedentary or light work.  <u>Id.</u>

After the ALJ entered his decision, Plaintiff submitted records from a March 3, 2007, admission to the DePaul Health Center after experiencing chest pain. (Id. at 314-15.) He was treated for unstable angina; a myocardial infarction was ruled out. (Id. at 315.) He underwent a cardiac catheterization, revealing a stent in his left anterior descending and circumflex. (Id.) His left ventricular function was within normal limits. (Id.) He was monitored for a day after the catheterization and was released on March 6 in stable condition. (Id.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th

Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must have a severe impairment.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).  The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his] ability to work."  **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. §§ 404.1520(d), 416.920(d), and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted).  Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical

records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting <u>Lacroix</u>, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2001). This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Wagner**, 499 F.3d at 851 (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting <u>Pearsall</u>, 274 F.3d at 1218). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). "Past relevant work" is "[w]ork the claimant has already been able to do" and has been "done within the last 15 years, lasted long enough for him or her to learn to do it, and was substantial gainful activity." 20 C.F.R. § 220.130(a). "[A]n ALJ must make explicit findings on the demands of the claimant's past relevant work." **Zeiler v. Barnhart**, 384 F.3d 932, 936 (8th Cir. 2004).

The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet his burden by eliciting testimony by a vocational expert ("VE"), **Pearsall**, 274 F.3d at 1219, or "[i]f [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational

backgrounds, and previous work experience, with differing degrees of exertional impairment," **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001). "However, when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability." **Id.**; accord **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006). See also **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (noting that the Guidelines may be employed if the nonexertional impairment does not diminish or significantly limit the claimant's RFC); Social Security Ruling 83-47C, 1983 W.L. 31276, *3 (S.S.A. 1983) ("[I]f the nonexertional limitation restricts a claimant's performance of a full range of work at the appropriate [RFC] level, nonexertional limitations must be taken into account and a nonguideline determination made.").

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to

determine whether the Commissioner's decision is supported by substantial evidence, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999).  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision."  **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000).  See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff first argues that the ALJ erred in his assessment of Plaintiff's RFC by ignoring the medical evidence of his history of anxiety, borderline intellectual functioning, depression and  psychosis; by improperly assessing his credibility; and by not calling a VE to testify.

In support of his first argument, Plaintiff cites impairments of psychosis, borderline intellectual functioning, and depression.  The first and last were listed as diagnoses in the first record of Dr. Jos.  Plaintiff consulted Dr. Jos then about his anger.  It is clear that the diagnoses were not made during that visit, just as the records fail to include any treatment notes relevant to listed diagnoses of GERD, degenerative joint disease, or headaches.  Also, Plaintiff was never diagnosed with borderline intellectual functioning.  The tests that indicated

such an impairment were, according to licensed psychologist who administered them, not valid for any diagnostic purposes.

Plaintiff also cites the GAF of 50 attributed to him by the licensed psychologist. This assessment is clearly based on Plaintiff's description of his functioning, and not on any longitudinal treatment or evaluation of Plaintiff. See **Brown v. Chater**, 87 F.3d 963, 964 (8th Cir. 1996) (permitting ALJ to discount health care provider's statement as to claimant's limitations because such conclusion apparently rested solely on claimant's complaints); **Woolf v. Shalala**, 3 F.3d 1210, 1214 (8th Cir. 1993) (finding that ALJ could discount conclusory statement of disability based on claimant's subjective complaints). On the other hand, his treating psychiatrist assessed his GAF as 70. "The [social security] regulations provide that a treating physician's opinion . . . will be granted 'controlling weight' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" **Holmstrom v. Massanari**, 270 F.3d 715, 720 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000)) (alteration in original); accord **Cox v. Barnhart**, 471 F.3d 902, 907 (8th Cir. 2006); **Goff v. Barnhart**, 421 F.3d 785, 790 (8th Cir. 2005). The longer a claimant's health care provider has treated him and the more times, the more weight is given to that provider's opinion. 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i). And, the more knowledge a physician has about the claimant's impairments, the more weight given to that physician's medical opinion. 20 C.F.R. §§ 404.1527(d)(2)(ii), 416.927(d)(2)(i). Dr. Jos was

Plaintiff's treating physician.[8]  His assessment of Plaintiff's GAF was properly given more weight than Mr. Sklar's.

In support of his first argument, Plaintiff additionally cites the opinion of Nancy Rodenberg, a nurse, that he was qualified for SSI by his mental and physical impairments. This opinion was rendered after Plaintiff had been to the VA two days after being released from the hospital after the four cardiac stents were inserted.  He had not seen Dr. Jos and a depression screening was negative.  There is nothing in the medical record to support Ms. Rodenberg's conclusion.  <u>See</u> **<u>Randolph v. Barnhart</u>**, 386 F.3d 835, 839 (8th Cir. 2004) (finding that ALJ had not erred by discrediting opinions and findings of claimant's treating physician; treating physician completed checklist that mirrored mental impairment's listing, her treatment notes did not indicate she had sufficient knowledge on which to base her conclusion that claimant could not work, and she never asked claimant about his abilities to function in areas that she concluded he could not); **<u>Strongson v. Barnhart</u>**, 361 F.3d 1066, 1071 (8th Cir. 2004) (holding that it was reasonable for ALJ to give little probative value to treating physician's conclusory statement that claimant was vocationally impaired when such statement was without explanation and was not consistent with physician's treatment notes).

The severity of Plaintiff's mental impairments, and physical impairments, depends on his testimony to be disabling.  The ALJ, however, found that testimony not to be credible based, in part, on inconsistencies in the record.  There are such inconsistencies.  For instance,

---

[8]Indeed, it appears from references in the medical records that Dr. Jos had treated Plaintiff before his heart attack.

the objective medical findings do not support Plaintiff's complaints of disabling impairments, see **Barrett v. Shalala**, 38 F.3d 1019, 1022 (8th Cir. 1994), and the consistent description of him as being alert and pleasant do not support his complaints of debilitating anger, see **Juszczyk**, 542 F.3d at 632. His failure to exercise, as repeatedly instructed by his doctors, and to participate in the recommended cardiac rehabilitation program and anger management program also detracts from his credibility. See **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008); **Holley**, 253 F.3d at 1092; **Kisling v. Chater**, 105 F.3d 1255, 1257 (8th Cir. 1997). There are other inconsistencies in the record. For instance, Plaintiff's wife reported that he had anger issues while he was employed at the meat packing company but his anger had gotten worse after his heart attack. However, Plaintiff and his wife were inquiring about disability two days after the attack, while he was still hospitalized, and before any increase in anger could be manifested. Plaintiff once reported that he would get aggravated by friends; elsewhere, he said he liked visiting with friends and neighbors. He reported he did little work around the house; his wife reported that he was trying to clean out the house. He described a severely restricted ability to engage in any physical activity, yet his exercise tolerance was average for his age and sex. See **Finch**, 547 F.3d at 938 (ALJ's assessment of claimant's impairment was properly supported by medical records which showed occasional difficulty with functioning that claimant described as disabling). He sometimes reported drinking an occasional glass of wine on the weekends; elsewhere he reported drinking ten glasses of wine at each setting, two or four times a month. He said he was compliant with his medication, but ran out of prescribed medication at least three times and waited until a medical appointment

to report such. He gave a social history of being a nonsmoker, but smoked cigars. He complained of a memory loss, but recalled in detail what he had been doing before his heart attack. In addition to this inconsistencies, the lack of any restrictions placed on Plaintiff's activities by his treating physicians after March 2005 also detract from his credibility. See **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999).

Plaintiff further argues that the ALJ's finding that he is limited to simple tasks precludes reliance on the Medical-Vocational Guidelines. The ALJ found that Plaintiff had a limited education. A limited education, as defined in the regulations, does not allow a person to "do most of the more complex job duties needed in semi-skilled or skilled jobs." 20 C.F.R. §§ 404.1564(b)(3); 416.964(b)(3). Unskilled work, according to the regulations, is work consisting of simple duties. 20 C.F.R. §§ 404.1568(a), 416.968(a). Thus, the ALJ's conclusion that Plaintiff's anxiety restricted him to simple work is consistent with the Guidelines' calculation that a limited education restricted a claimant to unskilled work..

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED

and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  10th  day of September, 2009.